## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

KIMBERLY JO FRANKS,

    *Plaintiff*,

*v.*                         CASE NO. 2:13-CV-13073

CAROLYN W. COLVIN          DISTRICT JUDGE NANCY G. EDMUNDS
Commissioner of Social Security,    MAGISTRATE JUDGE PATRICIA T. MORRIS

    *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Commissioner's decision denying Plaintiff's claims for Disability Insurance Benefits ("DIB"). This matter is currently before the Court on cross-motions for summary judgment. (Docs. 9, 11.)

Plaintiff Kimberly Jo Franks was forty-eight years old at the time of the most recent administrative hearing. (Transcript, Doc. 6 at 49.) Plaintiff's work history report includes jobs as a residential and commercial cleaner from 1989 until 2005, a grocery store manager from 1989 until 1995, an assembly line worker in an eyeglass lense factory from 1994 to 1995, a bartender from 1997 until 2001, a furniture deliverer from 1999 until 2000, and an office cleaner from 2006 through the hearing date. (Tr. at 43, 57, 329, 334, 353-55, 386.) Though her testimony and records are somewhat vague, she worked in 2010 and 2011; at one time apparently for an assisted living community, (Tr. at 51-54, 291), and later worked "doing in-home private care for a personal doctor."[2] (Tr. at 54.)

Plaintiff filed the present claim for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act 42 U.S.C. § 401 *et seq.* (Tr. at 242-45, 263-69.) On the same day, Plaintiff protectively filed for Supplemental Security Income ("SSI") under Title XVI, 42 U.S.C. § 1381-1385. (Tr. at 259-62, 270-78.) She filed amended applications on February 8, 2011, fixing the alleged disability onset date as February 28, 2010. (Tr. at 263-79.)

The claims were denied at the initial administrative stage. (Tr. at 100-01.) In denying the claims, the Commissioner considered Plaintiff's breast cancer. (*Id.*) On July 29, 2012, Plaintiff appeared before Administrative Law Judge ("ALJ") MaryJoan McNamara, who considered the application for benefits de novo. (Tr. at 39-99.) In a decision dated August 16, 2012, the ALJ

---

[2] The administrative law judge ("ALJ") found her work after the February 28, 2010 onset date was not substantial gainful activity. (Tr. at 21.) Her earnings in 2010 and 2011, $9,394.00 and $9,172.00 respectively, (Tr. at 291), were each safely below the earnings levels used, in part, to measure substantial gainful activity. Soc. Sec. Admin., *Program Operations Manual System* DI 25001.001(84).

found that Plaintiff was not disabled. (Tr. at 19, 32.) Plaintiff requested a review of this decision on August 25, 2012. (Tr. at 14-15.)

The ALJ's decision became the Commissioner's final decision, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on May 14, 2013, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-3.) On July 17, 2013, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision. (Doc. 1.)

**B.      Standard of Review**

The Social Security system has a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the factual determinations are supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The administrative process provides multiple opportunities for reviewing the state agency's initial determination. The Plaintiff can first appeal the decision to the Social Security Agency, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). Once this administrative process is complete, an unsuccessful claimant may file an action in federal district court. *Sullivan v. Zebley*, 493 U.S. 521, 524-28 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction under 42 U.S.C. § 405(g) to review the Commissioner's final administrative decision. The statute limits the scope of judicial review, requiring the Court to "'affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005)

3

(quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The court's review of the decision for substantial evidence does not permit it to "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006)

(quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). *See also Mullen*, 800 F.2d at 545. The court can only review the record before the ALJ. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). *See also Jones*, 336 F.3d at 475. "[T]he . . . standard is met if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Longworth*, 402 F.3d at 595 (quoting *Warner*, 375 F.3d at 390). "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

A court's review of the Commissioner's factual findings for substantial evidence must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999))).

### C.        Governing Law

"'The burden lies with the claimant to prove that she is disabled.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (quoting *Foster*, 279 F.3d at 353). *Accord Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. § 401-34, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. § 1381-1385. Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe

6

impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474. *See also Cruse*, 502 F.3d at 540. The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.   ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff met the insured status requirements through September 30, 2014 and had not engaged in substantial gainful activity since February 28, 2010, the amended, alleged onset date. (Tr. at 21-22.) At step two, the ALJ concluded that Plaintiff had the following severe

impairments: "mood disorders, asthma, cystitis, diabetes, and degenerative disc disease." (Tr. at 22.) At step three, the ALJ found that Plaintiff's combination of impairments did not meet or equal one of the listings in the regulations. (Tr. at 22-24.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. at 30.) The ALJ also found that Plaintiff was forty-six years old on the alleged disability onset date, which put her in the "younger individual age" category. (Tr. at 31.) *See* 20 C.F.R. §§ 404.1563, 416.963. (*Id.*) At step five, the ALJ found that Plaintiff could perform a limited range of light work in jobs existing in significant numbers in the regional economy. (Tr. 24-32.)

### E.    Administrative Record

The first medical report in the record is a breast cancer check-up examination with Dr. John C. Reinstra on March 16, 2004. (Tr. at 457.) Plaintiff had breast cancer in 1996, it reoccurred in 1998 (Tr. at 449, 457), and she later underwent reconstructive surgery. While Dr. Reinstra's notes state that Plaintiff complained of "pain . . . on the left side," Dr. Reinstra found no abnormalities and planned the next appointment in one year. (*Id.*) On that visit in March 2005, and the following in March 2006, Dr. Reinstra found "no evidence of any recurrent disease" on the breast examination. (Tr. at 457-58.)

In May 2005, Plaintiff saw Dr. Earnie G. Fischer for progressively worsening headaches, esophageal issues, and occasionally numb hands. (Tr. at 450.) The notes mention a recent CT scan of her head that was "unremarkable," spinal x-rays showing mild disc space "narrowing," and another physician's diagnosis of thrush and esophageal spasm. (*Id.*) Medications were ineffective for the headaches but somewhat successful for the throat pain. (*Id.*) The physical examination did not produce any abnormal results. (Tr. at 449.) Dr. Fischer assessed chronic headaches,

odynophagia, esophageal spasm, and a history of anemia. (Tr. at 448-49.) He associated the headaches with tension, as the x-rays showed only minimal "changes." (Tr. at 449.) Oral thrush "seem[ed] unlikely" to Dr. Fischer; odynophagia was another possibility and he planned to treat it with magnesium oxide. (*Id.*)

Various CT scans, x-rays, and pathology reports from 2005, 2006, and 2009 appear in the record. (Tr. at 452-53, 461-70, 476-79.) They indicate generally normal findings: her cervical spine had mild degenerative changes, but no acute abnormality, (Tr. at 452.); the brain CT scan was normal, (Tr. at 453); the cervix pathology report was "[n]egative for intraepithelial lesion or malignancy," (Tr. at 466); lumbar spine, hip, and wrist bone mineral density were normal, (Tr. at 467, 477); the breast ultrasound did not uncover cystic or solid masses and was "[n]egative . . . for possible malignancy," (Tr. at 478); and the pelvic ultrasound found a small cyst but was otherwise "negative," (Tr. at 479.)

A 2006 endoscopy showed "no evidence of infection or gastritis or malignancy." (Tr. at 480.) The next endoscopy, performed in September 2009, resulted in a chronic gastritis diagnosis. (Tr. at 493, 495.) A colonoscopy on the same day found a rectal polyp. (Tr. at 494-95.) The physician characterized these as normal findings and stated no follow-up was needed. (Tr. at 496.) CT scans of the pelvis and abdomen, on September 26, 2009, showed a few different issues, including a labial cyst, minimal bibasilar atelectasis, and right lower quadrant intussusception. (Tr. at 768-69.)

In an examination on April 12, 2009, Plaintiff's breast implants from her post-cancer reconstructive surgery appeared to have ruptured. (Tr. at 777.) Later that year the implants were

removed and tests from that period showed she remained free of cancer. (Tr. at 541.) A February 2012 bone scan "showed no evidence of metastatic breast cancer . . . ." (*Id.*)

Plaintiff's records from the first half of 2010 focus on her neck and low back pain. In February 2010, Plaintiff had spinal radiology examinations due to potential osteoarthritis. (Tr. at 677.) Her cervical spine listed rightwards, which could have been "positional in nature" while her upper lumbar and lower thoracic spine listed leftwards. (Tr. at 677-78.) The radiologist observed marginal osteophyte formations at five disc levels and mild disc space narrowing at multiple levels. (*Id.*) The results were otherwise normal, and the overall diagnosis was mild degenerative disc disease in various areas of the spine. (*Id.*)

Plaintiff visited Dr. Michael J. Septer multiple times in the first five months of 2010 to treat this issue. (Tr. at 540-84.) She told him that she cracked her tailbone after hitting a pothole while riding on a motorcycle two years ago, and her "back has never been the same." (Tr. at 581.) The chronic back pain disrupted her sleep and sometimes caused her limbs to become numb. (*Id.*) Additionally, she mentioned other physical problems, including musculoskeletal pain, headaches, and issues swallowing. (*Id.*) She saw a chiropractor for many years, but could no longer afford the treatments and wanted to deal with the problem before she finished nursing school. (*Id.*) Walking, standing, twisting, and lifting exacerbated the pain, while manual manipulation and therapeutic measures helped. (*Id.*) The pain was moderate, sometimes sharp. (*Id.*)

Though somewhat unclear, and possibly boilerplate, the treatment notes for almost every session with Dr. Septer in this period–and in others–state that there were good improvements in her range of motion, general health, and functioning for daily activities; and Plaintiff was supposedly pleased with the results. (Tr. at 542-43, 545, 548, 551, 554, 558-59, 562, 566, 574, 577,

580, 583, 698, 702, 706, 710, 714, 721, 725, 729, 733, 737.) Nonetheless, the pain remained constant throughout. (Tr. at 540-84.) During the last visit in May, Dr. Septer also considered trigger point injections and decided to wait until the following appointment to decide. (Tr. at 543.)

Dr. Septer referred Plaintiff to a neurologist to examine her back and neck pain, and on March 5, 2010 she had her first consultation at the Saint Mary's Hospital neuroscience program. (Tr. at 504.) She rated the pain at eight on the VA scale, and stated it was made worse by sitting, sleeping, and working. (*Id.*) It had also began to spread to her left shoulder. (*Id.*) She also indicated problems with her feet and hands. (Tr. at 505.) The pain was associated with headaches and blackouts. (Tr. at 506.) Various treatments were "[s]omewhat" helpful: medications, ice, and chiropractic methods. (Tr. at 505.) The intake form ended with a brief social and work history, in which Plaintiff reported that she exercised every day, had been self-employed for twenty-one years, and was currently working. (Tr. at 507.) In an additional form, completed on March 10, Plaintiff asserted that the pain was severe, it prevented her from lifting heavy weights but not light or medium weights, she could not walk more than half a mile without increasing pain, and it affected her social life. (Tr. at 530.)

Plaintiff's initial evaluation at Saint Mary's was conducted by Teri L. Holwerda, a nurse, on March 5, 2010. (Tr. at 514.) Plaintiff said the pain was constant and made concentrating difficult. (*Id.*) She added that her "ambulatory tolerance" was two miles per day. (*Id.*) On examination, Ms. Holwerda noted Plaintiff's left shoulder did not have a full range of motion in "forward flexion, abduction, [and] internal and external rotation." (Tr. at 515.) Her acromioclavicular joint was tender, but impingement testing was negative and there was no instability in the shoulders, elbows, or wrists. (*Id.*) She had no weakness in heel and toe walking.

11

(*Id.*) Her spine had tender points and her "cervical spine range of motion" was "limited in left rotation as compared to right." (*Id.*) Flexion and extension of the spine were not painful (*Id.*) Her motor strength was normal in her arms. (Tr. at 516.) Ms. Holwerda recommended physical therapy, possible headache evaluation, and EMG testing. (*Id.*)

Later that month, on March 26, Dr. Shelley L. Freimark at Saint Mary's reviewed and endorsed an occupational rehabilitation plan of care for Plaintiff. (Tr. at 519-21.) The report stated that Plaintiff's pain was constant, occurring both when active and inactive; nonetheless, the reports stated that she was "better when she is moving slightly as well as with short periods of activity." (Tr. at 519.) Regarding her functional capacity, the report stated, "[p]rior to 2 years ago the patient was able to tolerate most daily activities. At this point, she cleans houses and has some difficulty with this because of the positions she must assume while cleaning." (*Id.*) The therapist who wrote the report also added various observations: Plaintiff's posture was poor, "she has mild cogwheeling with dorsiflexion testing, but no apparent motor deficits," her range of motion was "moderately restricted," various movements increased the pain, she had weakness in her hips and core muscles, and she was tender "to palpation of the right paraspinals." (Tr. at 520.) The report concluded that prospects for recovery were fair. (Tr. at 519.)

The rehabilitation treatments ended on May 4, 2010, after eight sessions. (Tr. at 518.) At that time, her lumbar and cervical range of motion was moderately restricted. (*Id.*) The movements continued to be painful, and many of the initial goals were not met. (*Id.*) The therapist concluded that Plaintiff's functioning was "significantly limited because of pain." (*Id.*) Dr. Freimark signed this sheet along with the therapist. (*Id.*)

12

On May 7, 2010, Plaintiff returned to Ms. Holwerda for a post-rehabilitation examination. (Tr. at 511-12.) Plaintiff indicated that her condition had deteriorated since March. (Tr. at 522, 524-29) The nurse observed that Plaintiff "is despondent about her pain. She has been told by another provider that if she continues working she will be in a wheelchair in 5 years." (Tr. at 511.) "On physical exam she has positive Waddell's testing and light axial loading . . . and giveaway weakness." (*Id.*) Ms. Holwerda was able to find x-rays and MRIs taken after Plaintiff's motorcycle accident in 2008. (*Id.*) These revealed only "minor disk degenerative changes at L2-3." (*Id.*)

Ms. Holwerda discussed "the degenerative changes that are minor, and that would be expected for someone her age," informed Plaintiff that "disk degeneration is not a universally painful phenomenon," and concluded that there were no appropriate surgical options. (*Id.*) Plaintiff's "despondency" evidently alarmed Ms. Holwerda and led her to recommend "that we send her for a behavioral eval[uation] and treat[ment] to help her with her coping." (*Id.*) Other treatments included exercises at home, potential injections from her primary physician if Plaintiff wished, and pain management methods if necessary. (Tr. at 512.)

Dr. Thomas M. Spahn conducted a mental health examination of Plaintiff for the state Disability Determination Services on July 28, 2010.[3] (Tr. at 590-94.) The emotional issues stemmed, it seemed, from her medical problems. (Tr. at 590, 593.) She "never considered suicide," but frequently cried and was irritable with others. (Tr. at 590.) She still went to church and Bible study every week, but her son, a young adult, lived with her to help "care for the home, as well as her." (Tr. at 591.) Her pained expressions "seemed legitimate" to the therapist. (*Id.*)

---

[3] Plaintiff's first mental health examination in January 2010 diagnosed anxiety, although the examiner's qualifications are unclear. (Tr. at 585-86.)

He further noted Plaintiff had "[n]ormal reality contact" and reasonable insight, though she tended to minimize her depression. (Tr. at 591-92.) She felt worthless at times and the therapist discerned "[a] rather disguised level of significant depression, as well as anxiety . . . ." (Tr. at 592.) The therapist also made the following observations: her "affect was appropriate," "[i]t is thought she copes well with very significant setbacks," she had proper orientation to her surroundings, her memory was intact, she was slightly impaired on the "[i]nformation" tests, and her judgment and abstract thinking was intact. (Tr. at 592-93.) The therapist assessed "[d]epression and anxiety secondary to [her] medical condition," though the depression was "mild in severity." (Tr. at 593.) Plaintiff's Global Assessment of Functioning ("GAF") Score was fifty-eight, signifying "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000). Plaintiff's prognosis was "limited, primarily due to [her] medical problems. The primary obstacles to employment" were physical and if she could somehow work, the therapist concluded, "the emotional factors would be expected to recede." (Tr. at 594.)

Dr. John R. Lobo, a urologist, examined Plaintiff on July 29, 2010. (Tr. at 657-58.) She explained her history of hematuria and various examinations, all of which were negative. (Tr. at 657.) Dr. Lobo had referred her to the University of Michigan in the past, and they "concurred that the hematuria had been thoroughly evaluated and did not recommend any further diagnostic interventions." (*Id.*) Instead, the University thought periodic evaluations were the best course. (*Id.*) Plaintiff was on a medication for "presumed interstitial cystitis," and other medications for pelvic pain and to prevent urinary track infections. (*Id.*) Dr. Lobo did not make any "new or worrisome

findings." (*Id.*) The following week, Dr. Lobo updated the notes, writing that the "hematuria . . . episodes have become less frequent," the urine cytology "has returned as negative for malignancy," the CT urogram was normal, and that an ultrasound was recommended to examine a left ovarian cyst. (Tr. at 656.)

Plaintiff underwent various examinations in August 2010. (Tr. at 647-52, 672-73.) A CT scan of her abdomen showed "a tiny 3-mm cyst in the mid right kidney medial aspect. In the mid kidney more centrally there is a 4-mm cyst." (Tr. at 672.) Two left ovarian cysts and a left bartholin glad cyst were uncovered by a CT scan of Plaintiff's pelvis. (*Id.*) A sacrum and coccyx CT scan on the same day displayed "[s]light sclerosis and small osteophytes . . . along the sacroiliac joint," but the examining physician concluded that there was "[n]o gross fracture of the sacrum or coccyx." (Tr. at 652.) At the end of August, Plaintiff had gastric and mid-esophageal biopsies that were negative for helicobacter organisms and mucosal eosinophilia respectively. (Tr. at 651.)

Plaintiff saw Dr. Septer on multiple occasions from August until November 2010. (Tr. at 597-652.) In August, she told Dr. Septer that certain medications made her sick and affected her mental state. (Tr. at 644.) She also reported that manipulation and manual therapeutic measures helped her back pain. (Tr. at 644.) She had headaches, dizziness, urinary burning, and blood in her urine. (Tr. at 645.) Dr. Septer thought she appeared in mild distress, and also noted various abnormalities: in the oral cavity, in her eyes, her scalp was tender, her jaw was tight and tense, and her neck had restricted motion. (*Id.*) However, she did not have weakness in her extremities, abdominal pain, or neurological issues. (*Id.*)

Later in the month, she denied that her pain was radiating or that there were related bladder symptoms. (Tr. at 640.) More thorough neurologic examination notes show she had "slight" issues with straight leg raises and her range of motion, but no other abnormalities. (Tr. at 641.) Her gait was also antalgic. (*Id.*) Dr. Septer diagnosed osteoarthritis or spondylosis. (Tr. at 642.) One week later, she described the pain as mild to moderate. (Tr. at 637.) Dr. Septer then added bursitis and sacroilitis to his diagnoses. (Tr. at 638.) She continued to receive cortisone injections. (Tr. at 634, 639.) When she returned at the end of August, she stated that she "felt great" after getting a facet injection. (Tr. at 632.)

On September 7, 2010, Plaintiff told Dr. Septer that her back pain had become sharp at times. (Tr. at 629.) The examination results mirrored those done in August, with the same abnormalities and other observations. (Tr. at 630.) However, on September 14, Dr. Septer noted that there were no abnormalities in Plaintiff's gait. (Tr. at 623.) On September 29, Plaintiff received a joint injection, telling Dr. Septer that she could not walk without the shot and the injections were the "only thing that has helped." (Tr. at 618.) She hoped to "get 2 [weeks] off work to recover," (*Id.*), but after the shot she returned to work, stood all shift, and later reported that the injection did not have much effect. (Tr. at 613.)

Her condition had worsened, she reported, by the next appointment with Dr. Septer on October 11, 2010. (Tr. at 611.) Nonetheless, the severity of the pain was now mild to moderate. (*Id.*) Dr. Septer also learned on this visit that Plaintiff smoked three to four cigarettes per day. (*Id.*) In November, she told him the pain "has been building back up again. I was doing great for awhile." (Tr. at 602.) The pain was moderate and dull, and had spread to her chest wall. (*Id.*) By the end of the session, however, her range of motion had increased by seventy percent. (Tr. at 604.)

16

At some point during the fall, Plaintiff developed uterine issues. (Tr. at 683.) In November, Dr. Stephen F. Rechner examined Plaintiff, finding her ovaries, uterus, and cervix to appear normal. (Tr. at 609.) On December 7, 2010, Dr. Rechner performed a hysteroscopy, dilatation, and curettage to investigate Plaintiff's postmenopausal bleeding and "rule out malignancy." (Tr. at 667.) The surgeon found the cervix was "quite stenotic, and the endometrial cavity was nearly completely obliterated by scar tissue from a previous endometrial ablation. (Tr. at 668.) Curettage began but Dr. Rechner stopped once he established that the uterus had been perforated, a "complication" noted on Plaintiff's discharge paperwork. (Tr. at 668, 670.) The post-surgery pathology report from the endometrial curettings found "[s]cant benign endocervical and ectocervical mucosa," but was insufficient for an endometrial evaluation. (Tr. at 688.) Plaintiff left the hospital on December 8, 2011, in good condition. (Tr. at 670.) A check-up on December 30 reported normal findings, and even the small cysts on the ovaries did not prevent Dr. Rechner from concluding that the ovaries appeared normal. (Tr. at 684.)

Plaintiff continued seeing Dr. Septer through the first part of 2011. (Tr. at 693-735.) In November and December of 2010, Plaintiff's elbow began hurting. (Tr. at 735, 739.) The notes for the December 6 session also mention abnormalities in her gait, range of motion, and "Inspection/Palpations/ Motion/Stability/Strength." (Tr. at 736.) However, many of the neurological tests did not uncover abnormalities. (Tr. at 733, 737.)

On January 17, 2011, Plaintiff told Dr. Septer that one of her diabetes medications ran out and she had trouble paying for more. (Tr. at 723.) Without the medication, she said, "I am feeling like I did before I first came to [Dr. Septer] . . . . [It] helped more than I thought." (Id.) She was attempting to enroll in a patient assistance program through the pharmaceutical manufacturer. (Tr.

at 725.) Dr. Septer also noticed bruising on her tailbone, though she denied injuring it. (*Id.*) At the end of the month he provided more injections for pain relief. (Tr. at 722.) On January 19, 2011, a CT scan report of the sacrum and coccyx, ordered by Dr. Septer, noted that the "sacral arcs are symmetric. Segmentation of the coccyx is present, a normal variation. No definite fracture or dislocation is seen." (Tr. at 661.)

At the next visit, on February 8, 2011, Plaintiff reported that she had been in a car accident earlier that week. (Tr. at 716.) She did not have contusions, and Dr. Septer wanted her to avoid unnecessary x-ray exposure, so they decided to treat her pain conservatively. (Tr. at 718.) The next week, she requested manipulative treatment "since her spine finally started to reduce [muscle] spasms" and she thought the spasms "will go now." (Tr. at 712.)

She saw Dr. Septer again on February 22, 2011 because her pelvis felt like it was "seperating [sic] [from] the rest of [her] body." (Tr. at 708.) Dr. Septer planned to contact the Mayo Clinic to see if Plaintiff could receive treatments there. (Tr. at 710.) Plaintiff promised to "be [more] diligent in [following] home care directions." (*Id.*) Plaintiff returned a few days later complaining of congestion and bloody stools, which by the time of the appointment seemed to have stopped. (Tr. at 704.) A few weeks later, at her next appointment, Plaintiff stated her back was bothering her. (Tr. at 700.)

Dr. Robert J. Baird examined Plaintiff's mental health for the state Disability Determination Services on May 3, 2011. (Tr. at 740-44.) Plaintiff told him she had three to four panic attacks per day over the last year. (Tr. at 740.) During these episodes, she experienced "increased heart rate, perspiration, nausea, generalized anxiety, and trembling." (*Id.*) Her depression began during the same period. (Tr. at 741.) She tearfully explained that her mood had become "ornery" and, because

bathing was "'too strenuous,'" her hygiene had suffered as well. (*Id.*) Her poor physical health prevented her from participating in her usual social activities, such as a Susan G. Komen breast cancer awareness event involving motorcycles. (*Id.*) She tried to do household chores, but her son generally shopped for groceries, prepared meals, and cleaned the house. (Tr. at 741-42.) She denied suicidal ideations. (Tr. at 741.)

Dr. Baird observed her slow gait and evident physical pain. (Tr. at 742.) Her speech and hygiene were normal, however, and she was "pleasant and cooperative" with average intelligence and proper orientation. (*Id.*) Her emotional reactions were "[f]riendly, but very depressed," and he noted that "she experienced some hallucinations in a reaction to some unknown antidepressant one year prior . . . ." (*Id.*) Dr. Baird added that Plaintiff had been on Xanax for two years and received counseling services at her church once per week. (Tr. at 740.) He assessed a GAF score of forty-five, (*Id.*), indicating "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Am. Psychiatric Ass'n, *supra* at 34. His prognosis was guarded, and he thought her mental condition precluded "employment at this time." (Tr. at 744.)

On June 24, 2011, Plaintiff began seeing Dr. Shahnaz Ali. (Tr. at 863.) She was not suffering from chest pain, shortness of breath, or dyspnea on exertion. (*Id.*) However, she did appear to be going through artificial menopause. (Tr. at 864.) Their appointment in August raised the same issues. (Tr. at 865-66.)

Plaintiff obtained a comprehensive cytology report from Spectrum Health in February 2012, to examine her interstitial cystitis. (Tr. at 752-64.) She claimed that her flank pain rated at level

nine on a VA scale. (Tr. at 754.) The notes state, "[g]ross hematuria is painless and [the] flank pain [is] constant [and] not changed with urinary symptoms." (*Id.*) She also provided a detailed list of symptoms: she was fatigued, but had no "activity change" or weight change; she had rhinorrhea; her eyes were not painful or sensitive; she had orthopnea, but no chest pain, palpitations, or leg swelling; she still had trouble swallowing, nausea, constipation, and rectal bleeding; she did not have abdominal pain, blood in her stool, or rectal pain; she had hermaturia and pelvic pain; she had headaches and numbness, but no dizziness or light-headedness; and she had anxiety but no depression.[4] The objective examination at Spectrum found her neck and musculoskeletal range of motion was normal. (Tr. at 756-57.) The final diagnosis was gross hematuria and chronic interstitial cystitis. (Tr. at 757.)

Dr. Marc R. McClelland examined Plaintiff's pulmonary system, and reviewed past medical records on February 28, 2012. (Tr. at 844.) She complained of dyspnea, beginning nearly two years prior. (*Id.*) Tasks at work, such as cleaning the floors or walking quickly, produced shortness of breath, coughing, and wheezing. (*Id.*) Her chest did not have pains, but sometimes felt "'heavy.'" (*Id.*) Dr. McClelland wrote that Plaintiff was "a lifetime nonsmoker." (Tr. at 845.) He observed the following: that "[i]n general, she is in no distress and is breathing comfortably at rest," her neck was supple, her lungs clear without wheezes or crackles, her chest expanded symmetrically, her heart was regular, and her abdomen non-tender. (Tr. at 846.) Dr. McClelland could not discern the etiology of the dyspnea and decided to order pulmonary function studies. (*Id.*) He reviewed those studies a few days later, which showed an obstructive defect, mild to moderate in severity and significantly improved following bronchodilator administration. (Tr. at 847.) It was "a fairly

---

[4] The list's validity is questionable. The narrative on the previous page states Plaintiff came in for flank pain, but the list says she is "[n]egative" for flank pain. (Tr. at 756.)

common and treatable lung condition," and he laid out a plan relying on inhalers. (*Id.*) Her lung volumes and diffusion were normal, suggesting there was no "restrictive defect." (*Id.*) He suspected that the results from a February 2012 report showing a restrictive defect, (Tr. at 861), were "based upon patient effort, rather than an actual restrictive defect per se." (Tr. at 847.)

On February 28, 2012, Plaintiff had a CT urogram. (Tr. at 759.) The "tiny renal cyst seen on the prior exam [has] not significantly changed . . . ." (*Id.*) The scan also found "[s]ubtle subcentimeter hypodensities within the liver," "[n]on-opacification of the distal left ureter," and "[i]leocolic intussusception." (*Id.*) On March 14, 2012, Plaintiff had a cystoscopy, finding "[c]lear efflux from each orifice, no tumors, stones, or diverticula." (Tr. at 765.)

Plaintiff saw Dr. Martin A. Luchtefeld on March 22, 2012 regarding generalized abdominal pain. (Tr. at 840.) A recent abdominal CT scan confirmed the ileocecal intussusception first discovered in a 2009 CT scan. (*Id.*) Her rectal bleeding and constipation continued as well. (*Id.*)

On July 3, 2012, Plaintiff saw April M. Powell, a nurse practitioner, regarding her persistent cough. (Tr. at 853.) Plaintiff was recently married, allowing her to use her husband's insurance and thus giving her hope she could obtain more treatments in the future, such as one of the inhalers she was prescribed but unable to afford. (*Id.*) Ms. Powell observed that Plaintiff's neck and musculoskeletal range of motion were normal, her mood and behavior appropriate, and her chest and pulmonary examination was normal. (Tr. at 855.)

On June 27, 2012, Plaintiff returned to Dr. Ali, complaining of increased anxiety and numbness. (Tr. at 867.) Dr. Ali added, her "[m]ood has been good and overall doing well." (*Id.*) The etiology of her generalized numbness was unclear, but Dr. Ali concluded that her chronic pain was stable. (Tr. at 868.)

21

Only a few specific functional capacity reports are in the record, and these came from physicians reviewing Plaintiff's medical records for the state agency. (Tr. at 120-23, 148-51.) On July 7, 2010, Dr. Manmohan Kamboj submitted the following restrictions: lift twenty pounds occasionally and ten pounds frequently; in a workday, stand or walk for six hours and sit for six hours; unlimited ability to push and pull; frequently engage in various "postural" activities, such as climbing stairs and kneeling; and she had no manipulative, visual, communicative, or environmental limitations. (Tr. at 120-21.)

On August 31, 2010, Dr. Ruqiya Tareen submitted a mental functional capacity report. (Tr. at 122-23.) She found the following limitations: Plaintiff had moderate limitations on understanding, remembering, and carrying out detailed instructions; and there were also moderate limitations on her ability to work at a consistent pace. (Tr. at 122.) However, she found "no objective data to support the presence of any mental disorder affecting the cognitive abilities markedly at present which can preclude [the claimant] from performing . . . work related activities on [a] sustained level." (Tr. at 122-23.)

On May 13, 2011, Sitamahalakshmi Kondapaneni offered restrictions identical to Dr. Kamboj's except for the following: occasionally climb ladders, ropes, and scaffolds; occasionally crawl and kneel; and avoid concentrated exposure to extreme cold, heat, humidity, vibration, and hazards. (Tr. at 148-49.) Dr. George Starret, a doctor of education, provided a list identical to Dr. Tareen's except the following: Plaintiff had no understanding or memory limitations; her ability to concentrate for extended periods was moderately limited; her ability to work closely with others without distraction was moderately limited; her ability to interact with the general public and to get along with coworkers and peers was moderately limited. (Tr. at 150-51.) He concluded,

22

"[Plaintiff] retains the capacity to perform simple repetitive tasks within any established physical limitations in a setting in which her interactions with co-workers and the general public is limited." (Tr. at 151.)

At the hearing, Plaintiff testified that in 2009 she obtained a certified nursing assistant license and a phlebotomy license. (Tr. at 49-50.) During her brief time as a nurse's assistant, she could not lift or transport patients and so her employer "released" her. (Tr. at 50-51.) She was surprised at the lifting requirements because the employer had not included them in any pre-employment statements. (Tr. at 51-52.) She later worked doing in-home private care, where no lifting was necessary; but she did push her client in a wheelchair, "put him in bed," and helped him dress. (Tr. at 54.) She quit in December 2011. (*Id.*) Her current job involved cleaning a small office building for one hour per week. (Tr. at 57.) She said her son did most of the cleaning, such as vacuuming and mopping, while she dusted. (*Id.*) It paid seventy dollars per week. (Tr. at 58.)

Her breast cancer was in remission and she did not receive any follow-up treatments after the implant removal procedure in 2009. (Tr. at 55.) She explained that her insurance did not cover such treatments, nor did it cover psychological care or an inhaler she needed. (Tr. at 55, 58-59.) However, her physicians gave her a substitute for the inhaler. (Tr. at 58-59.) She had a different prescription for an emergency inhaler, which she used twice per day as prescribed and usually two to three times per day for emergencies triggered by movements, exercise, and excessive talking. (Tr. at 59-60.)

She testified that she had major surgery on May 23, 2012, removing much of her small intestine, "a foot of [her] large intestine, and a great portion of [her] colon." (Tr. at 61.) During the surgery, they discovered her large intestine had polyps, which were removed, tested, and the results

"came back negative." (Tr. at 62.) After the surgery, the physician told her "that it's coming along, but that things will never be normal like they were . . . . But just . . . take it slow and watch for infection." (Tr. at 61-62.) She received an Oxycontin prescription, but took Tramadol instead because she did not "want to be stuck on a narcotic." (Tr. at 63.)

The ALJ asked about her various treatments. She went to physical therapy in the past to treat her degenerative disc disease, and had an upcoming appointment with a neurosurgeon. (Tr. at 68.) The therapists gave her exercises to strengthen her back muscles. (Tr. at 69.) Plaintiff said she was not receiving mental health treatment, though there was a counselor at her previous primary care appointment. (Tr. at 71.) Xanax helped to calm her and "take[] the edge off." (Tr. at 71-72.) Plaintiff testified that she was vigilant about her diabetes, checking her blood-sugar level twice a day, preparing for emergencies, and taking her medicine. (Tr. at 77-79.) Plaintiff's breast cancer treatments, she said, suppressed her immune system and led to cystitis, which in turn caused thrush. (Tr. at 80.) She was placed on various antibiotic cycles, as recently as December 2011. (Tr. at 80-81.) She had taken antibiotics for the past five years. (Tr. at 81.)

Regarding her daily activities, she said she drove once or twice per week, never more than ten miles, and could dress herself, but that caused pain. (Tr. at 64, 76.) She also mentioned that she was married on May 19, 2012. (Tr. at 64-65.) She did not use an assistive device for walking, but she had a special pillow in bed to support her back and neck. (Tr. at 66.) She no longer rode motorcycles after her accident. (Tr. at 67.) Her car accident in 2011 did not cause any serious injuries. (Tr. at 67-68.) She sat frequently during the day, but that would become uncomfortable after a period, so she would walk until that hurt as well. (Tr. at 73.) Her pain was constant, she

24

explained, and prevented much physical activity and even interfered with her interpersonal communications. (Tr. at 76.)

Her son cooked at night and she spent the evenings with him. (Tr. at 74.) He would also clean, and Plaintiff's mother would help as well when she visited every other week. (Tr. at 75.) Her husband worked two jobs, six days per week and she suggested they only went to church together for joint social activity. (*Id.*) She still attended weekly Bible study sessions, each lasting up to one hour. (Tr. at 72.) Her other social activity was talking with friends over the phone, but she would rarely join them at events or meet with them in person. (Tr. at 72-73.) She also read the Bible and a few other books. (Tr. at 73.)

The ALJ also asked if there were other symptoms or impairments she wished to discuss. (Tr. at 79.) Over the past four months, her fingers, forearms, shins, and the bottom of her feet lost sensation; her physician said it was neuropathy. (Tr. at 79-80.) She also suffered chronic headaches, likely from the osteoarthritis in her neck. (Tr. at 82.) Plaintiff's attorney then asked her about the effects of interstitial cystitis. (Tr. at 84.) Plaintiff also complained of various other issues, including frequent urinary track infections and kidney stones. (Tr. at 84.)

The ALJ then asked the vocation expert ("VE") to classify Plaintiff's past relevant work. (Tr. at 87.) The VE said the bartender position was semi-skilled work performed at the light exertional, as classified by the Dictionary of Occupational Titles ("DOT"). (*Id.*) Her janitorial work was unskilled, as was her work as a self-employed residential cleaner. (Tr. at 88.) Finally, the nursing assistant position was semi-skilled. (*Id.*)

The ALJ then posited to the VE an individual with Plaintiff's background who

has residual functional capacity for light work. This individual can stand, sit, or walk six hours each of an eight-hour work day. This individual can occasionally climb

ramps . . . ladders, ropes, or scaffolds. This individual can occasionally kneel, occasionally crawl. This individual should avoid concentrated exposure to extreme cold and heat, humidity, vibration. This individual should avoid concentrated exposure, as well, to fumes, odor, dusts, gases, and poorly-ventilated spaces, as well as to hazards and heights. This individual has the capacity to perform simple, repetitive tasks. This individual should probably be task-oriented rather than production pace. This individual can interact with other[s] occasionally–or should interact with others–probably would be better off interacting with others only occasionally. Would this hypothetical individual . . . be able to perform any of the claimant's past relevant work?

(Tr. at 88-89.) The individual could work as a house cleaner, the VE responded. (Tr. at 89.)

Additionally, the person could work in other occupations as a laundry worker (42,000 positions in Michigan), a collator (2,200 positions in Michigan), and a mail-room clerk (25,000 positions in Michigan). (Tr. at 89-90.) The ALJ then asked how a sit-stand at-will option would affect the analysis if included in the hypothetical above. (Tr. at 90.) The individual could not perform any of Plaintiff's past work, but could still work as a collator, a laundry worker, and also an assembly machine tender (44,000 positions in Michigan). (Tr. at 91.) Taking the individual from the second hypothetical, the ALJ's final hypothetical added that the individual would be off-task twenty percent of the time. (*Id.*) No work would be available for such an individual. (*Id.*)

## F.  **Analysis and Conclusions**

### 1.  **Legal Standards**

The ALJ determined that during the time Plaintiff qualified for benefits, she had the residual functional capacity ("RFC") to perform a limited range of light work:

the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant needs a sit and stand at will work option. The claimant can occasionally climb ladders, ropes, or scaffolds. She can occasionally knee[l] and crawl. The claimant should avoid concentrated exposure to extreme heat and cold, humidity and vibration. She should avoid concentrated exposure to fumes, odors, dust, gases and poorly ventilated spaces as well as hazards and heights. The claimant has the capacity to perform simple

26

repetitive tasks. She should be task oriented rather than production paced and is better off working with others occasionally.

(Tr. at 24.) Light work

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2. Substantial Evidence

If the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. 42 U.S.C. § 405(g); *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Plaintiff's entire argument is easily reproducible. She criticizes the ALJ's hypothetical for inaccurately describing his impairments, citing regulations and case law explaining this requirement and also law concerning the RFC. (Doc. 9 at 6-10.) She then notes that she has "documented . . . degenerative disc disease, degenerative joint disease, headaches, obesity, posttraumatic stress disorder, and depression, yet the ALJ found claimant is capable of making

27

successful adjustment to other work . . . ." (*Id.* at 10.) Following this statement, she recounts in

three succinct sentences her testimony at the hearing, followed by her complete argument:

> The claimant testified at the hearing that she was not able to drive, and is limited to 1 to 2 times per week in driving; requires pain medication to calm her nerves; has to constantly check her blood sugars; and is not able to do any physical activities around the house due to pain. Additionally because of the pain, she is not able to sleep and suffers from sleep apnea. As a result, Ms. Franks is required to take a lot of medication.
>
> Finding that Ms. Franks was capable of performing the positions of a laundry worker, collator, and assembly machine tender while she continuously required the need to sit and stand sit and stand at will [sic]; [and operate under the other restrictions in the RFC] . . . is not substantiated. To subject Ms. Franks to perform these positions further subjects her to pain and suffering. Requiring someone with these disabilities to be subjected to the possibility of more pain and humiliation is not justified, it's inhumane. The limitations that Ms. Franks faces effectively preclude her from performing any work, including the listed representative occupations, and the reasoning to support her lack of credibility is not substantiated.
>
> More so, the hypothetical question asked of the VE included claimant's education and work with her being capable of performing a range of representative work with additional limitations of sit/stand option was improper. Ms. Franks indicated that she could not sit or stand for prolonged periods of time because of the spurs in her back. How can person who suffers from constant pain just because of the clothes that she may wear, as well as require frequent naps during the day [sic], possibly be expected to perform any of these positions? They can't. The hypotheticals are improper.
>
> Ms. Franks is incapable of performing even these representative jobs. Each of these jobs, as expected, requires the need to be on her feet for prolonged periods of time, require [sic] the use of her upper extremities, which go numb from time to time, and to do so could cause further or more prolonged damage.
>
> Based on the above arguments and relevant case law, Ms. Franks respectfully requests this Honorable Court to reverse the decision . . . .

(*Id.* at 10-11) (citations omitted). This comprises the length and breadth of Plaintiff's

argumentation. In essence, she relies on lines from her testimony–and no other evidence–to make

her case.

I suggest that the substantial evidence supports the ALJ's findings and recommend denying Plaintiff's Motion and granting Defendant's Motion.

### a.    Medical Sources and Plaintiff's Credibility

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. § 404.1520(a)(3); *Wyatt*, 974 F.2d at 683. The regulations carve the evidence into various categories, but the only relevant distinction for present purposes is between "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). There are important differences between the two types of sources. For example, only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2.

Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources, including treating opinions not given controlling weight, 20 C.F.R. § 404.1527(c), and the ALJ should almost certainly use the same analysis for "other source" opinions as well. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2. The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. § 404.1527(c).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion[, including treating sources]," regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's residual functional capacity ("RFC"),[5] and the application of vocational factors. *Id.* § 404.1527(d)(3).

---

[5] The Commissioner's discretion to determine the claimant's RFC is less capacious than it appears at first. While the ALJ determines the RFC, the ALJ might be required to give controlling weight to treating source opinions on specific limitations. *See* 20 C.F.R. § 404.1513(b)-(c) (describing that medical reports can include a source's "statement about what [the claimant] can still do despite [her] impairments"). These opinions would necessarily affect the RFC. *See Green-Young v. Barnhart*, 335 F.3d 99, 106-07 (2d Cir. 2003) (holding that treating physician's opinion that claimant could not sit or stand for definite periods "should have been accorded controlling weight").

Additionally, a physician's "notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the 'opposite of objective medical evidence.' . . . An ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)) "Otherwise, the hearing would be a useless exercise." *Id. See also Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (noting that there was no medical opinion in "Dr. Kllefer's pain-related statement . . . [because] it merely regurgitates Francis's self-described symptoms."); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) ("[S]ubstantial evidence supports the ALJ's determination that the opinion of Dr. Boyd, Poe's treating physician, was not entitled to deference because it was based on Poe's subjective complaints, rather than objective medical data.").

The regulations mandate that the ALJ provide "good reasons" for the weight he assigns the treating source's opinion in his written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ can properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision). "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights." *Cole*, 2011 WL 2745792,

at *4. "[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

When a disability determination that would be fully favorable to a claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789 at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner*, 375 F.3d at 390. However, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky,* 35 F.3d at 1036.

The social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). The ALJ ascertains the extent of

the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "'objective evidence of the pain itself'" is not required, *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweicker*, 749 F.2d 1066, 1071 (3d 1984)), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(I)   [D]aily activities;

(ii)   The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)   The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)   Treatment, other than medication, . . . received for relief of . . . pain;

(vi)   Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3). *See also Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247. *See also Cruse*, 502 F.3d at 542 (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and

33

credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones*, 336 F.3d at 475 ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

### b.   Analysis

Plaintiff attacks the ALJ's findings for distorting his limitations in the RFC. The only evidence she mentions in the argument comes from her own testimony. She does not address the ALJ's credibility analysis. Nor does she do more to counter the ALJ's specific points than simply recount some of her testimony and baldly assert that this convincingly contradicts the ALJ's findings. In fact, she contends that the contradiction raised by these scattered statements is so clear and palpable that the RFC is not merely mistaken but actually "inhumane." (Doc. 9 at 11.)

The ALJ's discussion shows that he sufficiently "consider[ed]" the evidence. 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3). First, the ALJ stated that he reviewed the Record under the relevant regulations and rulings. (Tr. at 21, 24.) In similar contexts, the Sixth Circuit has found such statements to approach the minimum needed to satisfy the regulatory requirements. *White v. Comm'r of Soc. Sec.* 572 F.3d 272, 287 (6th Cir. 2009) ("[T]he ALJ expressly stated that she had considered S.S.R. 97-7p, which details the factors to address in assessing credibility. There is no indication that the ALJ failed to do so."). In any case, the ALJ

34

went on to describe substantial sections of the medical evidence, highlighting information related to the factors in 20 C.F.R. §§ 404.1527(c), 416.927(c). (Tr. at 22-31.)

He examined how her impairments affected her daily activities. (Tr. at 23.) As he noted, the pre-hearing function report she completed stated that she did light household duties and laundry, shopped at the grocery store, and prepared meals for her son. (Tr. at 23, 345.) She further noted she had no problems with her personal care. (Tr. at 23, 346-47.) The ALJ then discussed the "mild difficulties" Plaintiff had in social functioning. (Tr. at 23.) Despite her impairments, she attended Bible study and church, recently married, and spent time with her family. (*Id.*)

The ALJ properly found that her mental functioning was moderately affected by her impairments. (Tr. at 23.) In the pre-hearing paperwork, she did not describe or mark any mental issues, aside from noting she had trouble completing tasks. (Tr. at 350-51.) Her son filled out a similar form with similar observations, though he noted that she had difficulty concentrating and handled stress poorly. (Tr. at 342-43.) Her first consultative examination report likewise mentioned a few limitations, but nothing that significantly affected her cognition. (Tr. at 594.) The ALJ characterized the second consultative examination as "largely normal," (Tr. at 25), based on the actual examination notes rather than Dr. Baird's conclusion of total disability. (Tr. at 744). The ALJ further refuted Dr. Baird's conclusions by noting that Plaintiff received no "additional therapy," never needed emergency or inpatient psychiatric services, and could handle her financial and other personal affairs. (Tr. at 25-26, 348-51.) The ALJ acknowledged that the lack of treatment resulted in part from her financial situation, but pointed out that low cost alternatives were not pursued.[6] In any case, the RFC incorporated mental restrictions by limiting her to simple, repetitive

---

[6] The ALJ elsewhere acknowledged her statement to Dr. Baird that she attended counseling at her church once per week. (Tr. at 29, 740.) There are no records from these sessions, however, and at the hearing she testified that

35

tasks at a "task oriented rather than production pace[]," and also keeping interactions with coworkers occasional rather than frequent. (Tr. at 24.)

Objective evidence supported the ALJ's findings on the alleged severity of Plaintiff's back pain, her primary complaint. (Tr. at 27-28.) The ALJ noted that the 2008 MRI after her motorcycle accident showed only minor degenerative disc changes at L2-3. (Tr. at 511.) Later x-rays and CT scans similarly found only mild degeneration, (Tr. at 677-78), and no fractures or significant problems with the sacrum or coccyx. (Tr. at 652.) Dr. Septer employed relatively conservative treatments, which appeared successful–at one point Plaintiff reported feeling "great" after a facet injection (Tr. at 27-28, 632, 693-739.) Plaintiff frequently called the pain mild or moderate, (Tr. at 602, 611), and even when she complained of sharper pain Dr. Septer's treatments helped, at one point increasing her range of motion by seventy percent. (Tr. at 604.) She did not use assistive devices to walk, and her gait was generally normal. (Tr. at 28, 66, 623.) Moreover, one month before the hearing Dr. Ali wrote that her chronic pain was stable. (Tr. at 28, 868.)

The ALJ noted the questionable basis for Plaintiff's pulmonary problems, which though established by testing were not found to be severe or insurmountable. (Tr. at 26.) Dr. McClelland cast doubt on a January 2012 test showing a restrictive defect, and his own testing uncovered only a mild to moderate obstructive defect. (Tr. at 26, 846-47.) The origin and nature of her dyspnea was "not immediately clear," Dr. McClelland noted. (Tr. at 846.) Upon further study, he found that the problem was "fairly common and treatable," and he prescribed appropriate medication. (Tr. at 847.) One of the final notes on her dyspnea came from a June 2011 appointment with Dr. Ali,

she was not receiving any mental health treatment. (Tr. at 71.) Moreover, one of the last observations of her mental and emotional status, made by Dr. Ali in June 2012, was that her "[m]ood has been good and overall doing well." (Tr. at 867.)

36

in which she denied chest pain, shortness of breath, or dyspnea on exertion. (Tr. at 28, 863.) The ALJ properly relied on this evidence and restricted the RFC nevertheless. (Tr. at 26.)

The ALJ adequately considered and addressed other medical issues in the written decision. (Tr. at 26.) The ALJ canvassed the records and gave a detailed description of the objective evidence. (Tr. at 26-30.) Her interstitial cystitis and gross hematuria did not present substantial impairments. Dr. Lobo noted the decreasing frequency of hematuria episodes. (Tr. at 656) Specialists at the University of Michigan felt that a conservative regimen of periodic evaluations of the hematuria sufficed. (Tr. at 657.) Her abdominal pain seemed to have abated after her surgery in May 2012, according to her testimony. (Tr. at 27, 61-63.) The ALJ also described Plaintiff's diabetes, including her testimony her hands and feet were becoming numb. (Tr. at 27.) However, this was a "relatively recent symptom," there was no objective testing supporting the numbness, she did not wear diabetic shoes, and based on her testimony she seemed capable of managing her diabetes through diet and blood sugar testing. (Tr. at 27, 77-80.)

The objective evidence provided the ALJ sufficient grounds to question Plaintiff's credibility. (Tr. at 28.) He did not doubt she experienced pain and "certain of the symptoms she claim[ed]," but found the alleged severity was unsupported. (*Id.*) In particular, he pointed out that despite some restrictions, (Tr. at 515, 518), numerous neurological and musculoskeletal tests were normal, and her range of motion was generally normal. (Tr. at 28, 599, 623, 641, 756, 842, 846.) The ALJ thus covered the subjective-evidence factors in 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3) and his conclusions are supported by substantial evidence.

Finally, the ALJ adequately considered medical opinion evidence.[7] (Tr. at 28-30.) The state agency consultants generally supported the conclusions eventually placed in the RFC. Dr. Kamboj's assessment was less restrictive than the ALJ's. (Tr. at 120-21.) This opinion and Dr. Kondapaneni's received "great weight" in the ALJ's analysis because they were experienced in the disability process and their opinions were consistent with the evidence. (Tr. at 29.) Dr. Kondapaneni's opinion was more persuasive, the ALJ explained, because it was more recent; and even then, it failed to include all of the restrictions in the RFC. (*Id.*) Dr. Spahn was also somewhat hesitant to ascribe limitations to Plaintiff, noting that her main problems were physical and as those improved the emotional issues would recede. (Tr. at 29, 594.) Dr. Tareen's recommendation that Plaintiff perform only simple tasks was adopted in the RFC. (Tr. at 29, 122-23.) The ALJ gave these opinions "great weight" because Plaintiff never received regular mental health treatment and she seemed capable of functioning, as evidenced by her part-time work. (Tr. at 29.)

The ALJ also sufficiently explained why he gave Dr. Baird's mental functioning opinion less weight. (Tr. at 29-30.) First, Dr. Baird's opinions appeared to come directly from Plaintiff's subjective complaints and as such, the ALJ did not owe them deference. *Poe*, 342 F. App'x at 156. Additionally, his GAF score of forty-five clearly clashed with the evidence: as the ALJ noted, the score "suggest[ed] someone who does not function without extreme intervention," whereas Plaintiff had never been hospitalized and was not seeking specialized mental health treatment. (Tr. at 29.) Dr. Baird's own observations similarly failed to support his conclusion. (*Id.*) The opinion contradicted the majority of other opinions and also the evidence from Plaintiff's daily activities.

---

[7] The ALJ also discussed the statements made by Plaintiff's son. (Tr. at 30.) He stated his mother helped to take care of him, looked after pets, did light housework, and cooked. (Tr. at 337-38.) The ALJ determined this contradicted the "preponderance of the medical evidence." (Tr. at 30.)

All of these observations represent appropriate factors the ALJ must consider when analyzing medical opinions. 20 C.F.R. § 404.1527. Consequently, his analysis is appropriate and supported by substantial evidence.

Because substantial evidence supports the ALJ's findings, and he considered Plaintiff's abilities in constructing his hypothetical and RFC, I accordingly recommend that Plaintiff's Motion be denied.

### 3.    Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

### III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.

*Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  July 31, 2014                    /S PATRICIA T. MORRIS
                                        Patricia T. Morris
                                        United States Magistrate Judge

## CERTIFICATION

I hereby certify that this Report and Recommendation was electronically filed this date and served on all attorneys of record via the Court's CM/ECF system.

Date:  July 31, 2014                    By     s/*Jean L. Broucek*
                                        Case Manager to Magistrate Judge Binder